RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KAREN RENEE HOWELL,

        *Petitioner-Appellant,*

    *v.*

REUBEN HODGE, Warden,

        *Respondent-Appellee.*

No. 10-5493

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:06-cv-108—J. Ronnie Greer, District Judge.

Argued: November 29, 2012

Decided and Filed:  March 13, 2013

Before:  SUTTON and STRANCH, Circuit Judges; STEEH, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Gary L. Anderson, Knoxville, Tennessee, for Appellant.  Nicholas W. Spangler, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.  **ON BRIEF:** Gary L. Anderson, Knoxville, Tennessee, for Appellant.  Nicholas W. Spangler, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    SUTTON, J., delivered the opinion of the court, in which STRANCH, J., and STEEH, D. J., joined.  STRANCH, J. (pp. 10–19), delivered a separate concurring opinion.

_____

[*]The Honorable George Caram Steeh III, United States District Judge for the Eastern District of Michigan, sitting by designation.

————————————

**OPINION**

————————————

SUTTON, Circuit Judge.  In February 1998, Karen Howell pled guilty to three counts of first-degree murder and several other offenses.  The state court sentenced Howell to three life sentences without parole for the murders and a host of other sentences for the other crimes, a set of punishments the Tennessee courts affirmed on direct appeal and declined to alter in reviewing Howell's state collateral-review proceeding.  Howell filed a habeas petition in federal court, arguing that she had received ineffective assistance of counsel before pleading guilty.  The district court denied the petition.  We affirm.

I.

On April 6, 1997, Howell and five friends left Pikeville, Kentucky, on their way to New Orleans.  At the time, Howell was seventeen, one of the others (Jason Bryant) was fourteen, and the other four (Joseph Risner, Natasha Cornett, Crystal Sturgall and Dean Mullins) were at least eighteen.  The group brought two guns with them and started the journey in a rickety car, prompting them to talk about upgrading their mode of transportation by stealing a better car.

At a rest stop near Greeneville, Tennessee, an opportunity presented itself.  Vidar Lillelid, a Jehovah's Witness, approached Howell and her friends while they were sitting at a picnic table.  Lillelid began sharing his religious views with the group, and it is fair to say that they did not get the message.  Risner displayed one of the weapons and told Lillelid, "I hate to do you this way, but we are going to have to take you with us for your van." *Howell v. Hodge*, No. 2:06-CV-108, 2010 WL 1252201, at \*2 (E.D. Tenn. Mar. 24, 2010).  The Tennessee Supreme Court described what happened next:

> Risner directed the Lillelid family to their van even though Mr. Lillelid
> offered the group his keys and wallet in exchange for allowing the family
> to remain at the rest area.

Mr. Lillelid drove the van, and Risner, who was still armed, sat in the passenger seat. Howell, Bryant, and Cornett also rode in the van with the Lillelids. Mullins and Sturgall followed in Risner's vehicle. Mrs. Lillelid began singing in an attempt to console the crying children, and Bryant ordered her to stop. Risner subsequently directed Mr. Lillelid to a secluded road and ordered him to stop the van. Once outside the van, all four members of the Lillelid family were shot multiple times. Bryant claimed that Risner and Mullins were the shooters, but Howell and her remaining co-defendants maintained that Bryant was the shooter. As Risner drove Howell and her co-defendants from the scene, the van struck one or more of the victims.

*Howell v. State*, 185 S.W.3d 319, 325 (Tenn. 2006).

Vidar, his wife Delfina and his six-year-old daughter Tabitha all died at the scene. Two-year-old Peter survived, but he lost an eye. The six defendants fled toward Mexico but were caught in Arizona after failing to cross the border. Howell and her cohorts still had several of the Lillelids' possessions when the authorities caught them.

The State of Tennessee filed charges against all six defendants and provided notice to the four older defendants that the State would seek the death penalty. The entire group, including the two juveniles, pled guilty in adult court in exchange for withdrawal of the death-penalty requests and in exchange for certainty about some of the other punishments. The proposed plea deal offered determinative sentences for some of the crimes (25 years for especially aggravated kidnapping, 12 years for aggravated kidnapping and 4 years for theft), and indicated that the trial court would impose the sentences for the felony-murder and attempted first-degree-murder convictions. The trial court sentenced Howell to three life sentences without the possibility of parole for the three murders and 25 years for the attempted murder of Peter Lillelid, ordering each sentence to be served consecutively. As required by the plea deal, she also received 25 years for especially aggravated kidnapping, 12 years for aggravated kidnapping and 4 years for theft, all to run concurrently. The Tennessee Court of Criminal Appeals affirmed Howell's sentence. *State v. Howell*, 34 S.W.3d 484, 515 (Tenn. Crim. App. 2000).

Howell filed a state law petition for post-conviction relief, alleging she received ineffective assistance of counsel. In her view, her attorney should have insisted that she undertake a psychological evaluation to determine if her mental condition required her to be committed involuntarily to a psychiatric institution. Had the attorney made this showing, she adds, Tennessee law would have prevented her from being transferred to adult court, at least at that point. The last state court to review this claim, the Tennessee Supreme Court, rejected it on the ground that, although the attorney had performed deficiently, Howell could not show prejudice.

Howell filed a habeas petition in district court. The district court rejected all of her claims, including several not mentioned here. It granted a certificate of appealability on the ineffective-assistance claim.

II.

The ground rules for reviewing Howell's appeal are not new. To establish ineffective assistance of counsel under the Sixth (and Fourteenth) Amendment, a claimant must show deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To obtain habeas relief after a state court rejects an ineffective-assistance claim, the claimant must show that the state-court adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations omitted). In rejecting Howell's claim, the state courts and federal district court focused on the absence of prejudice. We will do the same.

Under Tennessee law, a juvenile court "shall" transfer a juvenile defendant to adult court for prosecution and trial if the court has "reasonable grounds to believe" that (1) the juvenile committed the alleged delinquent act, (2) the juvenile is not committable to an institution for the developmentally disabled or mentally ill, and (3) the interests of the community require that the juvenile be put under legal restraint or discipline. Tenn.

Code Ann. § 37-1-134(a)(4)(A)–(C). The State readily satisfied the first and third requirements for transferring Howell to adult court given the circumstances of this triple murder. At stake is the second requirement. As Howell sees it, an attorney satisfying the Sixth Amendment right to counsel would have shown the need for an involuntary commitment, and as a result she would not have pled guilty to these offenses. As we see it, the state courts did not unreasonably reject this claim.

The state trial court held a post-conviction evidentiary hearing. Howell called two witnesses who testified she satisfied the prerequisites for an involuntary commitment at the time of the transfer hearing. The first witness was Dr. Leonard Miller. Based on his evaluation nearly six months after the transfer, Miller believed Howell could have met the standards for involuntary commitment under state law. The second witness was Dr. Pamela Auble. She evaluated Howell four years after the conviction and testified that (among other things) Howell could have been involuntarily committed.

The State defended this aspect of the conviction on three general grounds. One, the State pointed out that another psychologist, Dr. Larkin, examined Howell for thirty minutes before the transfer, and he concluded that she could not be committed involuntarily. No one challenged the existence of this interview or the existence of the assessment that arose from it. Two, the State discredited Howell's witnesses. As for Dr. Miller, it contended that his unequivocal testimony at the hearing was in tension with the equivocal report he wrote in 1998 immediately after evaluating Howell. *Howell*, 185 S.W.3d at 329–30. As for Dr. Auble, it pointed out that she did not interview Howell until four years after the transfer and that, even then, she relied on Dr. Miller's equivocal 1998 report. *Id.*; *see also* Howell App'x at 12. The thrust of Dr. Auble's report was not to question whether Howell could have been committed involuntarily but to discuss another issue no longer in the case, namely the voluntariness of her plea. Three, the State pointed out that Dr. Miller, when first contacted by Howell's counsel, warned counsel that it would be "quite difficult to avoid a transfer" from juvenile to

adult court. *Howell v. State*, No. E2003-01469-CCA-R3-PC, 2005 WL 394552, at *5 (Tenn. Crim. App. Feb. 18, 2005); *see also Howell*, 185 S.W.3d at 327.

In refereeing this dispute, the state court sided with the State, reasoning that Howell would not have been involuntarily committed even if she had introduced this evidence in support of her position. Howell has not met AEDPA's rigorous demands for overturning that decision.

First, the bar for involuntarily removing someone from society against her will is high—quite understandably and quite legitimately so. An involuntary commitment amounts to "a massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509 (1972). Preventing arbitrary and undeserved imposition of this restriction on freedom "has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Tennessee guards these interests through a demanding multi-step inquiry. At the time of the offense, a person could be involuntarily committed "if and only if" (1) the person was "mentally ill"; (2) the person posed "a substantial likelihood of serious harm because of the mental illness"; (3) the person needed "care, training, or treatment because of the mental illness"; and (4) "all available less drastic alternatives to placement in a hospital or treatment resource" were "unsuitable." Tenn. Code. Ann. § 33-6-104(b) (1997). Only if the State introduced "substantial" proof on each score, commensurate with the "weight and gravity" of the individual interest involved, could an involuntary commitment satisfy due process. *Addington v. Texas*, 441 U.S. 418, 427 (1979).

Second, Howell makes no argument with respect to one of these requirements. She offers no evidence that a commitment was the least restrictive alternative. Neither one of her experts mentions the point, much less offers "substantial" proof to support it. What's more, their reports suggest that less liberty-infringing alternatives existed, as they mention that Howell would benefit from therapy and medication, a form of care she was not receiving before the murders.

Third, the state court had the opportunity to assess the credibility of Drs. Miller and Auble firsthand, and it discounted the credibility of each of them when it came to

the likelihood that Howell would have been committed. Federal courts may not lightly ignore such credibility findings; they are entitled to "great deference" and "must be sustained unless [they are] clearly erroneous," particularly in the context of AEDPA-limited habeas review. *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (quoting *Batson v. Kentucky*, 476 U.S. 79, 98 n.21 (1986); *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)) (internal quotation marks omitted); *see also Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011).

Fourth, consistent with the state court's ruling, Howell's evidence was mixed or not on point. While Dr. Miller testified to one set of psychological circumstances at the 2003 hearing, his 1998 report mentioned other psychological circumstances. The 1998 report contained several observations that do not square with a finding that the high bar for removing someone from society against her will had been met. Dr. Miller, for example, noted that Howell was "alert, lucid and oriented in all spheres," "demonstrated balanced affect throughout" the evaluation, "did not demonstrate any signs or overt symptoms of anxiety or depression," "did not demonstrate any indication of hallucinations or delusions" and was "not suffering from primary mental retardation." Howell App'x at 139, 142. She "ha[d] the potential," he added, "to function within the average range of intelligence." *Id.* at 142. Surely this testimony suggests at a minimum that less-drastic alternatives to institutionalization would have been explored.

Even if Dr. Miller's testimony had been consistent, the subjectivity of psychological evaluations makes it difficult to say that there is only one way to look at Howell's mental health. A psychological evaluation is not an MRI. In the arenas of neurology and psychology, different experts often have competing opinions with respect to a given person's mental capacity. This is not to say that psychological testimony cannot in many instances be useful or even dispositive. But it does suggest that weighing psychological reports will always require some deference to the factfinder.

If Dr. Miller's testimony was equivocal, Dr. Auble's testimony was largely irrelevant. Her evaluation offers little to no support for Howell's position, given that four years had elapsed between the transfer hearing and her evaluation and given that Dr.

Auble focused on a distinct question—whether the plea was knowing and voluntary. The question was not Howell's psychological state in 2002 but her psychological state in 1998, and it was not whether the plea was knowing and voluntary but whether she should have been involuntarily committed.

All things considered, the state court fairly concluded that there were "reasonable grounds to believe" Howell was not committable in 1997, even after considering the later psychological evaluations of Howell. *See* Tenn. Code Ann. § 37-1-134(a)(4)(B). The bar for an involuntary commitment is high, as confirmed by the types of cases in which courts have permitted transfers—juveniles "suffering from mild mental retardation, depression with psychotic features, bipolar disorder, post-traumatic stress disorder, or a treatable drug problem." *State v. Jackson*, No. M2002-02248-CCA-R3-CD, 2004 WL 1402555, at *9 (Tenn. Crim. App. June 7, 2004). And Howell's evidence was not strong. At best, she put forward two experts whose testimony was full of gaps and in one instance was largely irrelevant. Neither expert suggested Howell would have been committable for more than a few months. Neither expert relied on any history of medication or treatment for psychological issues before the murders. Neither expert offered any explanation why that kind of care after the murders, surely a less-drastic alternative than an involuntary commitment, would not have addressed the psychological problems they identified. And neither expert indicated that Howell is being medicated or treated for psychological issues in prison. As required by due process, Tennessee law begins with a heavy presumption of noncommittability, and the state court reasonably concluded that Howell's appellate counsel had not supplied enough credible evidence to overcome that presumption.

Howell faces a second prejudice problem. When a defendant makes an ineffective-assistance claim after pleading guilty, she must establish a reasonable probability that, but for her counsel's ineffectiveness, she would not have pled guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Were Howell contending that she should spend a lengthy time in a mental institution, her prejudice theory might sound more credible and less opportunistic. But that is not her

theory. Neither she nor her experts claim an involuntary commitment in 1997 would have been permanent or lasted much more than six months. At some point, in other words, Howell would have faced responsibility for her admitted role in the three murders. It is Howell's burden to explain what the consequences of being temporarily committable in 1997 mean today. Had she been evaluated before the transfer hearing by someone else, she appears to suggest, the State would have involuntarily committed her, her codefendants would have been convicted, and she, upon her release from a mental institution, would no longer have pled guilty. Perhaps; perhaps not. The problem is that she knowingly and voluntarily pled guilty to the murders, and even today she does not deny the truth of her role in the deaths of the three Lillelid family members.

That takes us back to where we started. "*Strickland*'s test for prejudice is a demanding one," *Storey*, 657 F.3d at 379, and requires a petitioner to prove that the "likelihood of a different result" is "substantial, not just conceivable," *Richter*, 131 S. Ct. at 792. The state court determined that there was not a substantial likelihood that Howell would have obtained a different result with better counsel. Because this was not an unreasonable application of federal law, we must afford the state court's decision the "deference and latitude" demanded under AEDPA. *Id.* at 785.

### III.

For these reasons, we affirm.

———————————

**CONCURRENCE**

———————————

JANE B. STRANCH, Circuit Judge, concurring.  I concur with the majority opinion but write separately to address a part of the analysis of the expert opinions, found here and in the state court decisions, that I find troubling.  My concern arises from the transfer hearing during which no expert testimony or evidence was entered into the record regarding the likelihood that Howell was committable to a mental health facility. *See* Tenn. Code Ann. § 37-1-134(a)(4)(B).  Though her counsel provided notice that he would challenge transfer to adult court based on Howell's committability, he did not ultimately do so.  And though he was ordered to have Howell evaluated prior to the transfer hearing, he failed to have Dr. Miller do so until afterward.  The State's expert, Dr. Larkin, interviewed Howell for about 30 minutes before the transfer hearing and he allegedly issued a one-page letter stating that she was not committable and that she met the standards for transfer to adult court.  That letter is not in the record and has not been provided to this court.  It was not until sentencing that Dr. Miller evaluated Howell and submitted a report and not until the post-conviction hearing that Dr. Miller testified to his opinion that Howell was committable at the time of transfer.  The post-conviction court refused to credit Dr. Miller's conclusion and determined that the details of his report refuted his testimony.  Howell argued that her counsel was ineffective and she was prejudiced.  The state supreme court agreed with the former but not the latter.

Were the only inquiry in this case a comparison between Dr. Miller's[1] allegedly incredible report and Dr. Larkin's non-existent report, and a determination of whether Dr. Miller's report would have affected the juvenile court's decision on Howell's committability, I would be inclined to hold that the state court came to an unreasonable conclusion.  Although a state court's credibility determination on federal habeas review is undoubtedly afforded great deference, *see Felkner v. Jackson*, 131 S. Ct. 1305, 1307

———————————

[1]Although the findings as to Dr. Pamela Auble's report are also challenged, I agree with the majority that they are largely irrelevant to the issue before us.

(2011) (per curiam), I am not convinced that the determination by the state post-conviction court that Dr. Miller and his report were not credible, a conclusion affirmed on appeal, was based on entirely reasonable conclusions. I find that the supposed inconsistencies between Dr. Miller's report and his testimony identified by the post-conviction court do not render his findings inherently incompatible.[2] The problematic nature of this finding is compounded by the fact that it was made in the absence of necessary information—Dr. Larkin's report and testimony. Because Dr. Larkin's report is nowhere to be found, the state courts could not compare it against Dr. Miller's report to determine what effect the inclusion of the latter might have had on the juvenile court's decision. It is not disputed that Dr. Miller is an experienced expert who performed a thorough evaluation of Howell through a lengthy interview process and produced a detailed report. Nor is it disputed that Dr. Larkin, though also an expert, met with Howell for approximately 30 minutes, produced a one-page letter never entered into evidence, and never testified. More importantly, because the post-conviction hearing included neither the report nor testimony from Dr. Larkin, his methods and the report on which the State relies were never subject to the crucible of cross-examination. Without these crucial components, it is hard to see how a reasoned decision could have been reached.

That said, this aspect of the decision to transfer Howell was not the only factor under consideration by the juvenile court. Nor would it have been the only thing considered by the state courts when deciding whether Howell had established ineffective assistance of counsel. Upon considering the additional components of the juvenile court's decision to transfer, I agree that the Tennessee Supreme Court did not unreasonably apply the clearly established federal law articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See* 28 U.S.C. § 2254(d)(1). I write separately, however, to explain my basis for this conclusion.

---

[2]For example, there was nothing presented to demonstrate, from a scientific or even a practical standpoint, why the observations in Dr. Miller's report that Howell was alert, lucid, verbal, and not mentally retarded at the time of evaluation contradicted his testimony that his diagnosis of bipolar disorder, post-traumatic stress disorder, and depression rendered her committable. Although a similar finding might be considered reasonable if based on expert testimony, the state post-conviction court made its credibility determination without any evidentiary or testimonial support to back it up.

First, it is important to outline the way in which the statute governing juvenile transfers, Tennessee Code Annotated section 37-1-134, operates. As noted by the majority, subsection (a) provides that "[t]he disposition of the child *shall be as if the child were an adult if*:" (1) the child was 16 or older at the time of the alleged conduct (although a child under 16 may be transferred when certain serious offenses are at issue); (2) the hearing is held in conformity with certain statutory requirements; (3) reasonable notice is given in writing to the pertinent parties at least three days before the hearing; and (4) "[t]he court finds that there are reasonable grounds to believe that:"

> (A) The child committed the delinquent act as alleged;
> (B) The child is not committable to an institution for the mentally retarded[3] or mentally ill; and
> (C) The interests of the community require that the child be put under legal restraint or discipline.

Tenn. Code Ann. § 37-1-134(a) (1997) (emphasis added). This is not the only component of the juvenile court's analysis, however. Subsection (b) provides that "[i]n making the determination required by subsection (a), the court shall consider, among other matters:"

> (1) The extent and nature of the child's prior delinquency records;
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> (4) Whether the offense was committed in an aggressive and premeditated manner;
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state.

The juvenile court's findings as to whether reasonable grounds exist to establish the three factors in subsection (a)(4) are then reviewed for an abuse of discretion. *See State v. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6 (Tenn. Crim. App. Aug. 31, 2010); *see also Atkins v. State*, No. W2006-02221-CCA-R3-PC, 2008 WL 4071833, at *7 (Tenn. Crim. App. Aug. 29, 2008) (denying post-conviction relief based

---

[3] The current version of the statute uses the term "developmentally disabled."

on counsel's failure to challenge defendant's transfer because, upon review of the record, the court "discern[ed] no abuse of discretion by the juvenile court in finding reasonable grounds to transfer the petitioner from juvenile court to criminal court to be tried as an adult").

As to the issue of whether reasonable grounds exist to find that the juvenile is not committable, Tennessee Rule of Juvenile Procedure 24 provides additional interpretive guidance:

> Unless the child appears in any way to be mentally ill or mentally retarded,[4] and unless personally or through counsel, asserts that the child is mentally ill or retarded, it shall be presumed that the child is not committable to an institution for the mentally ill or mentally retarded, and the court may so find. If mental illness is alleged, the court shall order psychological or psychiatric examination at any stage of the proceeding.

Tenn. R. Juv. P. 24(b)(4) (1997) (footnote added). The rule appears to provide that further inquiry into a juvenile's committability need not occur unless (1) he or she appears to the court to be mentally ill or mentally disabled and (2) the issue is raised by the child, either personally or through counsel. The Advisory Commission Comments note that "a presumption of noncommittability similar to that relating to sanity in criminal trials" exists, which "can be rebutted by evidence introduced by the defendant, and in such event the burden would shift back to the prosecution to persuade the court the child is not committable." However, the burden that is placed on the prosecution at this point is simply to persuade the juvenile court that reasonable grounds exist for finding the juvenile not committable.

Even if the three prongs of Tennessee Code Annotated section 37-1-134(a)(4) are not satisfied, however, it appears that a transfer might still be possible subject to the discretionary authority of the juvenile court. *See Howell v. State*, 185 S.W.3d 319, 329 (Tenn. 2006) ("Unless the[] grounds [in Tenn. Code Ann. § 37-1-134(a)(4)(A)–(C)] are found by the juvenile court, transfer from juvenile court to criminal court is subject to

---

[4]The term "mentally retarded" has been replaced with "intellectually disabled."

the juvenile court's discretion."). In other words, if the juvenile court determines that there are reasonable grounds to find Tennessee Code Annotated section 37-1-134(a)(4)'s requirements satisfied, it must transfer the juvenile to be tried as an adult; otherwise, the decision of whether or not to transfer is discretionary.

Second, and in light of this legal framework, we look to the evidence presented during Howell's juvenile transfer hearing. There was extensive testimony regarding the circumstances of the crimes, the injuries suffered by the victims, and the evidence connecting Howell and her co-defendants to the delinquent acts. There was also testimony about Howell's behavior and demeanor specifically. One of the employees at the Arizona juvenile detention center in which Howell was housed prior to extradition testified on cross-examination that Howell reached the highest level of privilege possible based on her behavior and agreed that this meant she was "a model detainee." Another employee from the detention facility indicated that Howell never caused a problem while there and always followed the rules. Counsel also cross-examined Howell's father regarding her behavior. He testified that she was well-behaved as a child (although he and Howell's mother were divorced when Howell was only seven) and that he had no problems with Howell during the five months or so she had been living with him prior to the commission of the crimes. Howell's brother testified that she babysat his child on a regular basis and exhibited no behavioral problems.

Testimony was also presented on the resources available for housing juvenile offenders. An employee from the Department of Children's Services testified that there was only one state facility for female juveniles who committed serious offenses and that it was overcrowded. He also testified to the short amount of time that a person Howell's age would spend under juvenile supervision—a maximum of six to eight months—and that it was possible that her detention would be even shorter if she obtained credit for good behavior. Following this hearing (which spans 423 transcript pages), the juvenile court determined that there were reasonable grounds to believe that Howell committed the delinquent act as alleged; that she was not committable to an institution for the

mentally ill; and that the interest of the community required that she be put under legal restraint or discipline.[5]

Even assuming that Dr. Miller's report had been presented at the transfer hearing to rebut the presumption in favor of non-committability, there was likely enough evidence presented to persuade the juvenile court to order Howell's transfer. Several witnesses testified regarding Howell's model behavior while in juvenile detention, where she had been detained for approximately a month. Her family members' testimony was similarly positive. While defense counsel obviously brought this testimony out in an attempt to demonstrate that Howell would be amenable to rehabilitative efforts in the juvenile system, it likely cut against her as to the issue of committability, as the juvenile court could also rely on the assessment of these witnesses in making its determination. For example, in *State v. Swatzell*, No. 01-C-019005CC00126, 1992 WL 25008, at *1 (Tenn. Crim. App. Feb. 14, 1992), the Tennessee Court of Criminal Appeals upheld the circuit court's acceptance of the juvenile court's transfer where there was conflict not only between the defendant's and State's experts regarding his committability, but where "[t]here was . . . a difference of opinion among the lay witnesses who testified about the defendant's actions, moods and general behavior." *Id.* Here, all the lay testimony that touched upon Howell's behavior was consistent and indicated, if anything, that treatment of her mental illnesses by means other than commitment might be appropriate.

In addition, the juvenile court had the opportunity to observe Howell during the proceedings. There is nothing in the transcript to indicate that the court had any concerns about the way Howell appeared or conducted herself. Adding Dr. Miller's positive observations into the mix—including that Howell was lucid, was not delusional, and functioned within the normal range of intelligence—there was enough for the juvenile court to conclude that there were not reasonable grounds to find her committable, notwithstanding the problems identified in Dr. Miller's report. As the

---

[5]There is reference in the record to the juvenile court's written findings of fact. While these findings were not included in the record on appeal to this court, it is clear that they were considered by the state courts during post-conviction proceedings. *See Howell v. State*, No. E2003-01469-CCA-R3PC, 2005 WL 394552, at *20 (Tenn. Crim. App. Feb. 18, 2005), *aff'd*, 185 S.W.3d 319 (Tenn. 2006).

majority correctly states, Tennessee courts have previously held transfers appropriate in cases where there was evidence to suggest that the juveniles "were suffering from mild mental retardation, depression with psychotic features, bipolar disorder, post-traumatic stress disorder, or a treatable drug problem." *State v. Jackson*, No. M2002-02248-CCA-R3-CD, 2004 WL 1402555, at \*9 (Tenn. Crim. App. June 7, 2004); *see also Swatzell*, 1992 WL 25008, at \*1 (upholding transfer despite conclusion by defendant's expert that he was committable to a mental institution because he exhibited "a very high level of depression, among other things"). As the majority also correctly notes, such rulings are likely related to the high threshold that must be met before a person can be committed to an institution for the mentally ill.**6**

In addition to the above-mentioned testimony, the juvenile court also heard testimony regarding the limited availability of juvenile facilities in Tennessee and the fact that Howell would spend very little time in the juvenile system based on her age. *Cf. Jackson*, 2004 WL 1402555, at \*9 (approving juvenile court's decision to transfer defendant despite its observation that he had mental problems based on its conclusion that "the one to two years he could potentially be in state [juvenile] custody would not make 'much head-way' in treating his condition"). The fact that Howell's behavior in the Arizona detention facility was so exemplary likely weighed heavily on the juvenile court; if Howell behaved similarly in Tennessee, she could potentially serve an even lesser sentence than the minimal one that was already applicable. Moreover, the offenses at issue were admittedly horrific crimes against people, which the transfer statute instructs should be given "greater weight in favor of transfer." Tenn. Code Ann. § 37-1-134(b)(3).

Based on this evidence, it is entirely possible that a state court would have upheld the decision to transfer Howell as within the juvenile court's discretion even if Dr. Miller's findings had been presented. *Cf. State v. Williams*, 784 S.W.2d 660, 663

---

**6**It should be noted, however, that the Tennessee Supreme Court specifically left open the question of whether a juvenile must be subject to involuntary commitment to prevent a transfer. *See Howell*, 185 S.W.3d at 330 n.6 (observing that the Court of Criminal Appeals has interpreted the juvenile transfer statute to mean that reasonable grounds must be found for involuntary commitment, but stating that "[w]e need not reach this issue under the circumstances of the present case").

(Tenn. Crim. App. 1989) (concluding that defendant's arguments that the trial court erroneously accepted his transfer because he had no record of prior offenses or a prior history of violence; had a treatable drug problem; and would be more appropriately be treated within the juvenile system, "when weighed with other mandated considerations and the entire proof, [did] not preponderate against the trial judge's decision to accept the defendant for treatment as an adult").[7] Because of the fact-intensive, discretionary nature of this decision, Howell would have faced an uphill battle in overturning the decision to transfer on direct appeal. This difficulty is only compounded when viewed through the lens of state post-conviction relief followed by federal habeas review.

The state court had the juvenile transfer hearing transcript before it and certainly considered the information contained in it. *See Howell*, 185 S.W.3d at 328 n.5 (noting that Howell was allowed to supplement the appellate record with the complete transfer hearing transcript). Although the Tennessee Supreme Court's decision does not explicitly mention these considerations, I assume that they informed its decision in some manner.[8] *Cf. Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (noting that, in the context

---

[7] Moreover, even *if* Dr. Miller's report had given the juvenile court "reasonable grounds to believe" that she was committable, that court could have, in its discretion, ordered a transfer based on the other information at the transfer hearing. *See Howell*, 185 S.W.3d at 329 (observing that if introduction of Dr. Miller's report would have given the juvenile court "reasonable grounds to believe" that she was committable, "we then must decide whether [its] decision to transfer Howell regardless of whether she was committable to an institution would constitute an abuse of discretion"). It is entirely possible that based on the gravity of the offenses, the nature of the crimes against the Lillelid family, and the fact that Howell would spend so little time under juvenile supervision, a state court would nonetheless have found that the juvenile court's transfer was appropriate.

[8] These factors were explicitly mentioned by the Tennessee Court of Criminal Appeals in its decision, which was then affirmed by the Tennessee Supreme Court:

[I]n its Findings and Recommendations, the juvenile court found the following:
  1. That the offenses were committed in an aggressive and premeditated manner against both persons and property[; and]
  2. That pursuant to testimony of State personnel of State agencies, that sources available to the State of Tennessee are limited, to such a degree, that possible rehabilitation of said child is not viable considering the gravity of the offenses and conduct in which said child engaged.
The Defendant does not contend that her lawyer's performance was responsible for these two findings, or that he could have done something to prevent the juvenile court from making these findings. Yet, in making the determination of the Defendant's committability, the juvenile court was required to consider the manner in which the offenses were committed, and whether or not a commitment would have resulted in rehabilitation. The juvenile court's findings on these two points, together with Dr. Larkin's opinion that the Defendant was *not* committable, convince us that the result of the transfer hearing would have been the same whether or not Dr. Miller had testified. That is, the Defendant was not prejudiced by Counsel's failure to have her evaluated by Dr. Miller prior to the transfer hearing.

of AEDPA review, "state-court decisions must be given the benefit of the doubt" (internal quotation marks omitted)).

I have recounted the evidence supporting the decision of the juvenile court at length because I believe it is important to clarify what I find problematic about the analysis of the expert reports and testimony. Clarification is especially important due to the significance of transferring a juvenile to adult court for trial and sentencing, even where a terrible crime such as this one is at issue. The United States Supreme Court's recent decision in *Miller v. Alabama*, 132 S. Ct. 2455, 2468 (2012), reviewed the considerations that it found must separate sentencing of adults from that of children, including: a juvenile's impetuosity and lack of appreciation of risks and consequences; her inability to escape brutal and dysfunctional social or home situations; her incompetencies in dealing with the criminal justice system; and other factors relating to the diminished moral culpability of children. The differences that make juveniles more susceptible to influence also result in a heightened capacity for change and, therefore, a greater prospect for reform. *Id.* at 2464-65, 2469. Thus, in reviewing a decision to transfer a juvenile to adult court—especially one that results, as here, in a sentence of life without parole—*Miller* teaches that we must always be cognizant of "the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* at 2469 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)). These considerations and concerns are highlighted by the specific holding in *Miller*—that the Eighth Amendment prohibits states from imposing sentences of "mandatory life without parole for those under the age of 18 at the time of their crimes." *Id.* at 2460.

*Miller*'s holding does not categorically foreclose the sentence of life without the possibility of parole imposed on Howell.[9] Language in the Court's opinion, however,

---

*Howell*, 2005 WL 394552, at *20 (citation omitted).

[9]Tennessee's murder statute does not require automatic imposition of a sentence of life without the possibility of parole. Instead, it provides the sentencing authority with the choice of death (which is obviously inapplicable where juveniles are concerned); life without the possibility of parole; and life.

highlights my concerns about the analysis necessary when making and reviewing decisions to transfer juveniles to adult court and raises questions regarding the propriety of the sentence of life without the possibility of parole in this case. The *Miller* majority observed that the reasoning of *Graham v. Florida*, 130 S. Ct. 2011 (2010), upon which it relied and which prohibits the imposition of life without the possibility of parole sentences on juvenile offenders for nonhomicide crimes, "implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Miller*, 132 S. Ct. at 2465. The majority also observed that "appropriate occasions for sentencing juveniles to [life without the possibility of parole] will be uncommon." *Id*. at 2469. Moreover, in his concurring opinion, Justice Breyer argued that, based on *Graham*, "the kinds of homicide that can subject a juvenile offender to life without parole must exclude instances where the juvenile himself neither kills nor intends to kill the victim." *Id.* at 2475-76. As here, one of the defendants in *Miller* was found guilty of felony murder and was not responsible for the killing, and no evidence indicated that he had any intent to kill. *Id*. at 2477. In Justice Breyer's view, before the State could continue to impose a sentence of life without parole for this defendant, it would first need to determine whether he "kill[ed] or intend[ed] to kill" because, "without such a finding, the Eighth Amendment as interpreted in *Graham* forbids sentencing [the defendant] to such a sentence, regardless of whether its application is mandatory or discretionary under state law." *Id.* at 2475 (internal quotation marks omitted). Though the scenario posited has parallels to Howell's situation, *Miller* is not necessarily dispositive and these issues are not before us today.

On the case before us and for the foregoing reasons, I conclude that the state court correctly held that Howell was not prejudiced by her counsel's deficient performance, and therefore it did not engage in an unreasonable application of clearly established federal law. Accordingly, I concur in the majority's decision to affirm the district court's denial of habeas relief.

---

*See* Tenn. Code Ann. § 39-13-202(c)(1)–(3).